644 So.2d 752 (1994)
STATE of Louisiana
v.
Christopher McCANTS.
No. 93 KA 1703.
Court of Appeal of Louisiana, First Circuit.
October 7, 1994.
*753 Walter Reed, Dist. Atty., Covington and William R. Campbell, New Orleans, for plaintiff-appellee State.
James H. Looney, Asst. Indigent Defender, Covington, for defendant-appellant Christopher McCants.
Before GONZALES, FOGG and PARRO, JJ.
FOGG, Judge.
Defendant, Christopher McCants, was charged by grand jury indictment with the first degree murder of Danielle Anderson, a violation of LSA-R.S. 14:30. Defendant pled not guilty and, after trial by jury, was found guilty as charged. At the sentencing hearing, the jury was unable to agree on a determination of the penalty to be imposed; under LSA-C.Cr.P. art. 905.8, the trial court imposed a sentence of life imprisonment without *754 benefit of probation, parole or suspension of sentence. Defendant has appealed, urging three assignments of error:
1. The trial court erred by failing to instruct the jury as requested by defendant.
2. The trial court erred by failing to grant defendant's motion for new trial on the basis of allegations that the prosecutor interfered with defense witnesses and other prosecutorial misconduct.
3. There was insufficient evidence upon which a rational jury could have found guilt beyond a reasonable doubt.
On September 11, 1990, defendant was living with Melanie Anderson (Anderson) and her daughters, four-year-old Charmaine Chantelle Gassery and two-year-old Danielle Anderson (the victim), at Anderson's mobile home in Slidell, Louisiana. At about 7:00 a.m. on September 11, 1990, Anderson went to work at the Check In Check Out food store, leaving the children with defendant. At about 1:30 p.m., defendant phoned her and informed her that he had found the victim on the floor and that she was barely breathing. Anderson received permission from the store manager to go home. Anderson, accompanied by defendant, took the victim to Slidell Memorial Hospital, where she was admitted at 2:23 p.m. Due to the victim's critical condition, she was transferred to Children's Hospital in New Orleans. On the following day at 11:25 a.m., she died.
Dr. Paul McGarry, the state's expert in forensic pathology and neuropathology, performed an autopsy on the victim on the day after her death. According to Dr. McGarry, the cause of death was multiple blunt injuries, the most serious of which were injuries of the head that caused hemorrhage inside the head, brain swelling and failure of the brain to continue to function.

ASSIGNMENT OF ERROR NUMBER ONE
In this assignment, defendant contends that the trial court erred by failing to give his requested special jury charge concerning immunity or reward. Defendant submits that a plea bargain under which Anderson (the state's key witness) pled guilty to cruelty to a juvenile was highly significant. He asserts that the alleged erroneous refusal to give the requested charge was not harmless and that his conviction was obtained, at least in part, due to the trial court's failure to properly instruct the jury on its obligation to view Anderson's testimony with great suspicion.
Defendant's requested special jury charge number one sought the following instruction:
IMMUNITY OR REWARD
1. If the jury believes from the evidence that any person was induced to testify in this case by any promise of immunity from further punishment, or that any hope was held out or entertained by her that she would be rewarded or in anywise [sic] benefit if she implicated the Defendant in the crime charged herein, the jury must take such fact into consideration in determining what weight should be given to the testimony, closely scrutinize it and unless they can reconcile with truth, completely reject it.
2. In weighing the testimony of a witness who testifies under any promise of immunity or award, the jury must consider that such promise of immunity or award of itself is a strong impelling reason for the witness to color and fabricate her testimony, and that such testimony must be weighed with a great deal of care and circumspection.
In its jury charges, the trial court addressed the subject of a witness' credibility and reasons for testifying, in pertinent part, as follows:
As jurors, you alone shall determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony and the circumstances under which the witness has testified. In evaluating the testimony of a witness, you may consider ... any reason he or she may have for testifying in favor of or against the State or the defendant, and the extent *755 to which the testimony is supported or contradicted by other evidence.
If you believe that any witness in the case has willfully and deliberately testified falsely to a material fact for the purpose of deceiving you, then I charge you that you would be justified in disregarding any part or all of the testimony of such witness as proving nothing and as unworthy of belief. You have the right to accept as true or reject as false the testimony of any witness accordingly as you are impressed with their veracity.
. . . .
The testimony of a witness may be discredited by showing that the witness will benefit in some way by the defendant's conviction or acquittal, that the witness is prejudiced, or that the witness has any other reason or motive for not telling the truth.
The trial court has a duty to give a requested charge, which does not require qualification, limitation, or explanation and is not included in the general charge or in another special charge to be given, if it is wholly correct and pertinent to the case. LSA-C.Cr.P. art. 807; State v. Shilling, 440 So.2d 110 (La.1983). In our view, defendant's requested charge on immunity or reward was one which required qualification, limitation or explanation; we agree with the trial court that the requested charge was substantially given and covered by the court's general charge, which addressed the subject of a witness' credibility and reasons for testifying as well as concomitant considerations and determinations of the jury.
Moreover, even if we assume, arguendo, that the failure to give the requested jury instruction constituted error, such error would be harmless. The refusal to give a requested special charge does not warrant reversal of a defendant's conviction unless it prejudices substantial rights of the accused. LSA-C.Cr.P. art. 921. See State v. Marse, 365 So.2d 1319 (La.1978); State v. Vergo, 594 So.2d 1360 (La.App. 2nd Cir.), writ denied, 598 So.2d 373 (La.1992). At trial, the state introduced State Exhibit S-16 which disclosed the terms of Anderson's plea agreement.[1] Additionally, during defense counsel's closing argument to the jury, he stressed that Anderson lacked credibility and to support his contention, he specifically referred to the terms of the plea agreement. In light of the admission of the terms of the plea agreement into evidence, the closing arguments of defense counsel, and the court's general charge regarding a witness' credibility and reasons for testifying, we are convinced that (even if the requested charge was erroneously refused) defendant was not prejudiced under these circumstances.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
By means of this assignment, defendant contends that the trial court erred by failing to grant his motion for new trial based on the prosecutor's (Mr. Simon's) alleged interference with defense witnesses during a recess of the trial declared during the prosecutor's cross-examination of defense witness Tracy Crawford.
LSA-C.Cr.P. article 851 provides in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
. . . .
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;

*756 . . . .
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment....
There is no indication in the trial transcript of the occurrence of the alleged prosecutorial interference. However, testimony pertinent to the allegation was elicited at the hearing on the motion for new trial.
Three witnesses, Joann McCants (defendant's stepmother), Tracy Crawford (with whom defendant was romantically involved) and Karen Crawford (Tracy's sister), testified on defendant's behalf at the hearing on the motion for new trial. The state presented the testimony of Michael S. Hughes, an investigator employed by the St. Tammany Parish District Attorney's Office who had been assigned to assist the prosecutors, Messrs. Berrigan and Simon.
Joann (who was also a defense witness at defendant's trial) testified that she was in the corridor outside the courtroom during Tracy's trial testimony when the trial recess was declared. Joann had already testified. After Tracy exited the courtroom, Joann asked Tracy if she had concluded her testimony. At the time, Tracy was "shaking and everything real bad." Joann noticed Mr. Simon approach, hollering at Tracy that she was not supposed to be talking to any other witness and that she was still supposed to be inside the courtroom. Simon also said something to Tracy about perjury, and he was very loud, upset and angry. Tracy was brought back into the courtroom. According to Joann, Albert Bell (a paralegal working for defense counsel), the bailiff and two detectives were also present. There was a group of people around the courtroom door, obstructing Joann's view as to how Tracy was brought back into the courtroom.
Tracy Crawford testified that when she exited the courtroom for the trial recess she was shaking and upset because she thought the prosecutor was being "real nasty" in his questions and the manner in which he questioned her on cross-examination.[2] When she got outside the courtroom, she saw Joann and Karen Crawford (who was supposed to be a trial witness for the defense). Simon walked out and yelled at Tracy, accusing her of perjury and saying that she was talking to other witnesses. As Tracy was reentering the courtroom. Simon was telling her she had to be in the courtroom. Simon grabbed her by the arm and walked very close to her as she was escorted back into court. Tracy also recalled that Simon was mumbling that he could not believe that defense counsel "put perjurers on the stand." Albert Bell was with her when she was outside the courtroom and when she came back inside.
Karen Crawford testified that she was subpoenaed to appear as a defense witness at defendant's trial. In response, she came to court and waited to be called. On the day Tracy testified, Karen was sitting outside the courtroom when Tracy exited the courtroom for the recess. After Joann asked Tracy if she had finished her testimony and Tracy replied that there was a recess, Mr. Simon came out shouting at Tracy. Simon was asking Tracy what she was doing outside the courtroom and saying that she had perjured herself. The record reflects that, according to Karen, Simon grabbed Tracy by the shoulders, guiding her back into the courtroom.
During Karen's direct examination, she gave the following testimony:
Q. Did you, subsequent to that incident, tell me that you had preferred not to testify in the trial of Chris McCants?
A. Yes, I did.

*757 Q. And would you please tell the Judge why you told me that you would prefer not to testify.
A. Because they had had her, you knowthe one, this man right here, Mr.what's his name
Q. Are you indicating Mr. Simon?
A. Yes. He was talking about something about she had perjured herself....
Thereafter on redirect examination, Karen testified as follows:
Q. Now, why did you choose not to testify in Chris McCants' trial?
A. Because of the, you know, impression whenwhat happened to Tracy. I felt like what happened to her, she came in and testified, and then I felt like the same thing would happen to me.
Q. If you had not witnessed the incident that you saw outside this courtroom, would you have taken the stand and testified?
A. Yes, I would have.
Investigator Hughes testified that he was in court at defendant's trial during Tracy's direct and cross-examination, and he recalled the recess that was taken during her cross-examination. During the recess, Simon and several other individuals were near the side door exiting the courtroom when Simon stated that he saw Tracy in the lobby talking to some of the sequestered witnesses and that he was going to look for a bailiff. Hughes stepped out the door and saw Tracy talking to Albert Bell and several of the other witnesses. In a normal voice, Hughes informed Tracy that she was not supposed to be out there and that Simon was going to look for a bailiff. Tracy walked back inside the courtroom. By the time Simon returned from looking for the bailiff, Hughes had already spoken to Tracy and she was back in the courtroom. Hughes did not recall Simon saying anything to Tracy, and he was close enough to her to have heard anything Simon might have said to her. He also did not see Simon touch Tracy.
On cross-examination, Hughes gave the following additional testimony:
Q. You didn't hear Mr. Simon say anything about he couldn't believe Mr. King would put on a witness who would give perjured testimony?
A. No. Not that I can recall.
Q. Did you hear the conversation that Mr. Simon and I had about that where he said the same thing to me?
MR. SIMON: Objection.
THE COURT: Overruled.
THE WITNESS: Later, after that incident, yes.
EXAMINATION BY MR. KING:
Q. How long after that incident; 30 seconds?
A. I couldn't give you a time on
Q. Fifteen seconds.
A. I don't know exactly.
. . . .
Q. You remember my coming up to this incident?
A. Yes, sir.
Q. Do you recall what I said?
A. Not in every word. You came back there wanting to know what was going on. You started talking to Mr. Simon and Mr. Berrigan [the prosecutors] as to what was going on.
Q. And what did you hear Mr. Simon tell me, Mr. Hughes?
A. Something to the effect that your witness was outside during a recess talking to some other witnesses out in the lobby.
Q. Is it a fact that he raised his voice to me and asked me whether I had instructed my witness as to the sequestration order; you remember that?
A. He probably did get louder than normal voice.
In denying defendant's motion for new trial on the alleged prosecutorial interference claim, the trial court gave oral reasons. The court stated that it believed Simon raised his voice and was upset during the incident which Simon perceived as a possible violation of the court's sequestration order. The court stated that it thought that Simon was concerned that someone might be talking to a witness and that (apparently as a *758 result of that possible communication) Tracy Crawford might change her testimony while she was still under cross-examination. More specifically, the court stated that it did not find that Simon meant or caused any harm and that it did not believe that what Simon believed was a violation of the court's sequestration order caused any prejudice to defendant to the extent that a new trial should be granted.
The excerpts of Karen Crawford's direct and redirect examination and of Hughes' cross-examination show that defense counsel was fully aware of the alleged prosecutorial interference when it happened or very shortly afterward. Additionally, the excerpt of Karen Crawford's direct examination reveals that defense counsel knew not only about the incident but that she had told him after the incident that she preferred not to testify at the trial and the reason why she had that preference. The defendant's knowledge of this alleged defect prior to the verdict precludes him from gambling on the verdict and later raising the alleged defect as a basis for a new trial. See LSA-C.Cr.P. art. 851(4); State v. McCloud, 357 So.2d 1132 (La.1978). See also State v. Duplissey, 550 So.2d 590 (La.1989); State v. Horne, 554 So.2d 820 (La.App. 5th Cir.1989). Moreover, we do not find any abuse of discretion by the trial court in concluding that under the circumstances there had been no showing of prejudice to the accused as is required to grant a motion for new trial. See State v. Sharp, 338 So.2d 654 (La.1976). We note that Karen Crawford's testimony at the hearing on the motion for new trial reflects that the testimony she would have given at trial would essentially have been only cumulative and corroborative of Tracy Crawford's testimony concerning defendant's visit with Tracy over the period of September 7-10, 1990, i.e., that Karen had seen defendant on each of those days while he was visiting Tracy.
In addition to the alleged prosecutorial interference with defense witnesses, defendant asserts on appeal that there was a pattern of alleged improper remarks by the prosecutors during the trial. Defendant sets forth these alleged improper remarks in his brief together with specific page references to the record corresponding to each allegation. The allegations as set forth are as follows. The prosecutor failed to show documents to defense counsel before showing them to a witness who was on the witness stand. On another occasion, the trial court indicated that it had hoped for testimony from the witness stand rather than from the prosecutor. Several times the trial court called attention to the prosecutor's failure to address the court when making remarks before the jury. Finally, during Mr. Simon's closing argument, he made reference to photographs which specifically had not been shown to the jury by agreement of the state and the defense.
However, the grounds stated in defendant's motion for new trial did not include any of these alleged improper remarks as a basis for a new trial. Nor does the record reflect that defendant ever otherwise requested that the trial court grant him a new trial based on any of these alleged improper remarks. Under these circumstances, defendant cannot now complain that the trial court erred by not granting him a new trial. Moreover, after carefully reviewing the record, we are convinced that, whether the alleged improper remarks are considered either singularly or cumulatively, defendant was not prejudiced by them; thus, even if defendant had moved for a new trial based on the alleged improper remarks he would not have been entitled to one.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
In this assignment, defendant contends that there was insufficient evidence upon which a rational jury could have found him guilty beyond a reasonable doubt. Defendant concedes that the perpetrator of the instant offense had the requisite specific intent to kill or inflict great bodily harm and argues that the key issue is whether the state proved he is the person who inflicted the injuries to the victim which resulted in her death. Defendant concludes that, although the instant offense may have been committed by him, the evidence does not rise *759 to the level of proof beyond a reasonable doubt that he was the perpetrator.
The proper method to raise the issue of insufficient evidence is by motion for post-verdict judgment of acquittal pursuant to LSA-C.Cr.P. art. 821. See State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983). The record does not indicate defendant made such a motion, but it does contain an assignment of error which alleges the evidence was not sufficient. Therefore, this Court will review the sufficiency of the evidence, although this issue was not raised properly. In doing so, we will consider the evidence as though a motion for post-verdict judgment of acquittal had been filed under LSA-C.Cr.P. art. 821.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged and defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See State v. Brown, 594 So.2d 372 (La.App. 1st Cir.1991), writ denied, 596 So.2d 552 (La.1992). See also LSA-C.Cr.P. art. 821 B; State v. Mussall, 523 So.2d 1305 (La.1988).
When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test is not a purely separate one from the Jackson constitutional sufficiency standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Rosiere, 488 So.2d 965 (La. 1986).
At the time of this offense, LSA-R.S. 14:30 provided in pertinent part as follows:
A. First degree murder is the killing of a human being:
. . . .
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve years....
Anderson testified that defendant would sometimes baby-sit her children when she was at work. Occasionally Dora Pinson would baby-sit the children at Pinson's home. No one else baby-sat the children.
Pinson testified that she began occasionally baby-sitting for Anderson's children in December of 1989 and last baby-sat for them on September 10, 1990. Over this approximate ten-month period, she never noticed any sign that the victim had been injured in any way until September 10, the last day she baby-sat the victim. Pinson observed a mark on the back of the victim's arm that looked like a burn.
Pinson testified that, while baby-sitting the victim at her home on September 10, she observed the victim playing and watching television. She did not observe anything unusual about the victim's behavior, and the victim did not complain to her of any problem. Pinson was not aware of the victim falling down on her steps, nor did anyone ever complain to her that such an incident had happened. Defendant brought the victim to her home that day and later picked her up.
Anderson's testimony reflects that, on one occasion, Anderson saw defendant strike the victim when she was not eating. Defendant "whipped her on the butt with the belt." On another occasion, when the victim "wet on herself," defendant brought the victim in the bedroom and shut the door. Anderson tried to push the door open while defendant had his foot pressed against it. Through a crack in the door, Anderson saw "the belt going up and coming down" and heard the victim crying.[3]
*760 Anderson testified that at about 7:00 a.m. on September 11, 1990, she left home to go to work at the Check In Check Out store. Before she left, both children were sitting up in the bed watching television. She kissed both of them and went to work, leaving defendant alone with them. When she left, she was not worried about the victim.
Anderson testified that, after she got to work, defendant phoned her, asking her to come home to have sex with him. She declined the request because she could not leave work. She then phoned a friend and asked the friend to either pick up her children or take them to the baby-sitter. However, the friend had a toothache and did not do as Anderson had asked. After receiving another call from defendant at around lunch time, defendant called her a third time at about 1:30 p.m., telling her that the victim was on the floor and barely breathing. Anderson received permission from the store manager to leave and proceeded home. She found the victim on the sofa, limp and barely breathing. The victim's head looked swollen. The victim's eyes were "barely open, like unconscious." Anderson tried to talk to her, calling out her name, but she never answered Anderson nor otherwise responded.
Anderson testified that she told defendant that she was taking the victim to the hospital. Defendant's reply was that the victim was just sleeping, to leave her where she was and she would wake up. Anderson asked defendant what had happened to the victim, and he answered that he did not know.
Anderson took the victim to Slidell Memorial Hospital, with defendant driving the car. Anderson testified that, when asked by hospital personnel what had happened to the victim, she stated that the victim had fallen from some steps a couple days before while at the baby-sitter's. However, Anderson testified that this statement was not true and that she made it because she was scared of defendant.
Anderson testified that her relationship with defendant changed after he moved in with her. In August of 1990, defendant started getting moody and he began hitting her and her children. Anderson testified that there were weekends and other days, after defendant moved in with her, that he would visit his family in Moss Point, Mississippi. According to Anderson, one Sunday when defendant returned to her residence, she told him about her concern at having found blood in the victim's potty. She was alarmed about finding the blood but did not seek medical assistance for the victim because "after two days, it stopped."
Anderson testified that she never struck the victim. Anderson stated that she did not recall the victim falling down stairs and striking her head on September 10, 1990, and that she did not know what happened to the victim.
Elaine Cobbs, the manager of the Check In Check Out store, testified that Anderson worked at the store on September 11, 1990, "punch[ing] in" at about 7:05 a.m. and "punch[ing] out" at about 1:45 p.m. that day. According to Cobbs, at about 1:30 that day, Anderson received a personal telephone call answered by Cobbs. The caller identified himself to Cobbs as "Chris" and Cobbs called Anderson to the telephone. After the call, Anderson came into Cobbs' office, distraught, crying, shaking and visibly upset. Cobbs told Anderson to "punch out," go home, and take care of her little girl.
Dr. Ursin Theomile Stafford, a staff emergency physician who was present when the victim was admitted to Slidell Memorial Hospital at 2:23 p.m., testified as an expert in emergency medicine. He stated that the victim was limp and unresponsive to all stimuli and that her respirations were shallow. According to the victim's mother, the victim had fallen down two steps two days previously, sustaining minor abrasions to the chest *761 without loss of consciousness. The mother also stated that she was called from work because the victim was having difficulty breathing.
Dr. Stafford examined the victim when she was admitted to the hospital. Dr. Stafford testified that he did not see any major trauma to or lacerations of the victim's head. His examination did reveal the following injuries. There were abrasions in the following places: below the victim's right nipple, above her left nipple, the right mid-quadrant, the right anterior thigh, the right outer thigh, left upper back, right upper shoulder, and the left and right lower quadrant. There were linear scratches to the left anterior chest area and bruises in the area of the pubic symphysis and the right lower quadrant. Dr. Stafford also noted the existence of a linear loop-shaped area to the right lower quadrant, which he stated would be consistent with a mark left from a blow with a belt. Additionally, there was a small cut on the victim's lower lip.
Dr. Stafford considered the victim to be critically ill and was concerned about her survival. According to Dr. Stafford, the history given by the mother was inconsistent with the injuries. Instead, the injuries were consistent with the victim having been beaten and indicative of possible child abuse. Prior to the victim's transfer to Children's Hospital, child protection authorities were consulted.
Dr. Judith A. Harris, a staff physician at Children's Hospital, examined her within minutes of her arrival on September 11. The record reflects that the victim was admitted to Children's Hospital at 8:33 p.m. on September 11. Dr. Harris testified that the victim's response to pain and the lack of reaction in the pupils of her eyes were signs of severe brain injury.
Dr. Harris testified that, within an hour of the victim's arrival at Children's Hospital, the victim was examined by Dr. Duncan (a neurologist). According to Dr. Harris, Dr. Duncan's neurological consult stated that a CT Scan showed left temporal blood over the surface of the victim's cerebrum and edema and developing papilledema, which was some evidence of a fairly recent injury.
Dr. Harris pronounced the victim dead at 11:25 a.m. on September 12, 1990. On the death certificate completed by Dr. Harris, she indicated that death was the result of increased intracranial pressure due to closed head injury, with the underlying cause of death being trauma to the brain. In Dr. Harris' opinion, the injury she perceived as causing death was new, i.e., injury occurring within twenty-four hours of the time she examined the victim. Thus, Dr. Harris stated that the injury could have occurred as early as 8:00 p.m. on September 10 (the day before the victim was brought to Slidell Memorial Hospital).
In Dr. Harris' opinion, the injuries suffered by the victim were consistent with child abuse and those of a child beaten by an adult and not those of a child falling down two or three steps. In particular, Dr. Harris stated that the degree of brain injury present in the victim was not compatible with a fall down stairs. In Dr. Harris' opinion, the injury that caused the victim's death was not an accidental injury as might occur in the case of a self-inflicted fall. Dr. Harris also stated that the victim's death was consistent with the mechanism of shaken baby syndrome and that such a syndrome could have been caused by any person substantially larger than the victim who shook the victim to her death.
Dr. Paul McGarry, who performed the autopsy on the victim, qualified and was accepted by the trial court as an expert witness in the field of forensic pathology and neuropathology. Dr. McGarry testified that he found numerous injuries on the victim's body. He described the victim's external injuries as follows. Her forehead was swollen and purple, and there was swelling and purple discoloration of the left side of the face down to the jaw area. Down the front of her chest there were large purple bruises and scrape marks on the skin going over the breast areas and down the abdomen onto the pubic area. Additionally, down the fronts, backs and sides of the thighs, inner aspects of the thighs and down the sides and backs of the arms and forearms, there were purple areas of swelling, hemorrhage in the skin and scrape marks on the skin.
*762 Dr. McGarry also performed an internal examination of the victim's remains. This examination showed areas of purple discoloration of the skin extending from the head downward onto the trunk of the body, the arms and legs. This area of discoloration was produced by recent bruises or hemorrhages in the skin. The skin was intact except for scraping of the outer layers, and the bruises extended deeply into the underlying tissue beneath the skin. He found bruises over the back, the front of the chest, the abdomen, down the pelvic area and legs and arms. One of the bruises on the back of the victim was continuous with a bruise that extended one inch into the left kidney.
Dr. McGarry did find some scars of old injuries of the skin, which he described as scrape marks that children get. The only bruise he found that was older than the total group of bruises present at the time of the autopsy was a small area of tan discoloration at the back of the head, a superficial bruise. According to Dr. McGarry, the older injuries predating those that caused death were indicative of possible child abuse but were not part of the cause of the victim's death. On the other hand, the other injuries he found were recent injuries of the same age.
Dr. McGarry stated that in his opinion the cause of the victim's death was multiple blunt injuries, the most serious of which were the injuries of the head that caused hemorrhage inside the head and brain swelling and failure of the brain to continue to work. He testified that in his opinion the injuries were inflicted within one to two hours of the time the victim was brought to Slidell Memorial Hospital in an unconscious state, i.e., within one to two hours of the victim's 2:23 p.m. admission to the hospital on September 11, 1990.
Dr. McGarry testified that in his opinion the injuries were not consistent with those that would be sustained in a fall or multiple falls of a child of the victim's age by her own activities. The injuries were not at all consistent with accidental injury. The injuries were in areas that do not get injured when a child falls, such as the insides of the thighs and the indentation of the back. According to Dr. McGarry, the injuries were the result of heavy blows delivered violently against the victim's body in different areas by another person much bigger and with much more power than the victim.
Dr. Gerald Edward Liuzza, an expert witness in pathology, testified for the defense. He reviewed the hospital records of the victim, Dr. McGarry's autopsy report and autopsy photographs of the victim. Dr. Liuzza testified that the nature of the victim's injuries was consistent with child abuse. In his opinion, the victim was beaten. Dr. Liuzza testified that it appeared that the victim had sustained a number of blunt type injuries that were very recent and some older injuries. He stated that the recent injuries included the bleeding around the brain and accompanying very severe swelling of the brain as well as a number of bruises located over the side of the face, the skin on the chest and abdomen, and the back of the buttocks and the arms. There were also a number of old injuries, a number of scarred areas of the skin throughout the chest, back, and buttocks. Based on the ages of the injuries, Dr. Liuzza stated that to him there had been a pattern of abuse extending back over many months. He indicated that some of the injuries suggestive of abuse might have been as old as six months or older.
Dr. Liuzza was in agreement with Dr. McGarry that the fatal injuries to the victim were the head injuries. The other injuries, in his opinion, either alone or in combination would not have been sufficient to explain death. Dr. Liuzza indicated that it was "very, very unlikely" that the injuries to the victim had been accidentally caused. Instead, it was his opinion that the victim had been beaten to death. He stated that he thought that the fatality was due to blunt trauma to the victim's head as opposed to shaking but that shaking could also have been present and could have contributed to the death. He further stated that any individual significantly larger and stronger than the victim could have inflicted the injuries upon her. In Dr. Liuzza's opinion, the recent injuries to the victim (other than the fatal head injuries) could have occurred from a couple of hours to a couple of days before the victim's death. However, he thought that *763 the fatal head injuries were "somewhat younger than two days old," and that (as of the time the victim was found to have severe brain injuries on September 11) the fatal head injuries could have been "anywhere from minutes old to a number of hours, say, ten, twelve hours old, possibly even longer than that. It gets less likely as you go longer." Dr. Liuzza also stated that it was very possible that the head injuries could have been sustained (as early as) on September 10, "especially much later in the evening, at night." He further stated that it was possible the victim could have been beaten to death in the home where she lived between 10:00 p.m. on September 10 and noon on September 11.
Deputy Sheriff Jay Daigle of the St. Tammany Parish Sheriff's Office investigated the case. At about 9:00 p.m. on September 11, he arrested defendant for attempted first degree murder and cruelty to a juvenile. Deputy Daigle advised defendant of his Miranda rights. Defendant was taken to an annex of the sheriff's office and again advised of his rights. He executed an advice of rights waiver form and then made a brief statement to the police. According to Deputy Daigle, defendant in his statement said that he lived at Anderson's home with her and her children, but said that he never baby-sat Anderson's children and he never struck the children, particularly with a belt.
Defendant presented the testimony of several character witnesses, Charlie McCants, defendant's father, Juliette Haines, defendant's mother, and Joann McCants, defendant's stepmother, who gave favorable testimony concerning defendant's reputation for truth and honesty. Additionally, defense witness Rachel Elizabeth Davis testified that in 1988 and 1989 defendant baby-sat her child several times. She testified that he was very good with children and never struck her child with a belt.
Defendant took the stand at trial in his own defense and denied any involvement in the charged offense. Defendant testified that, after he and Anderson met at the Check In Check Out store, a friendship between the two emerged. Their relationship became a sexual one with him moving into her home at her request. He had met Tracy Crawford before his relationship with Anderson became sexual. Crawford stayed overnight with him several times at Tarver's Motel, where he resided before moving in with Anderson. The romantic relationship which emerged between defendant and Crawford has continued.
When defendant moved in with Anderson, Firmin Victor and Shawanda Bridges were already living there. After moving in, defendant found out that Victor was selling illegal drugs and that Bridges was a drug user. According to defendant, Anderson would sit in the living room with Victor and Bridges smoking marijuana in front of her children. Victor and Bridges moved out of the residence about three weeks before the victim's death.
Defendant testified that after he moved in with Anderson, they had a good relationship for about a month and then it changed. After the relationship changed, (although he continued to reside with Anderson until his arrest) they stayed in separate rooms and there was no sexual activity between them.
Defendant testified that he got along well with both of Anderson's children and loved them as if they were his own. He would not have harmed either of them. Defendant testified that he did discipline the children as far as "popping" them on the hand or butt with his hand. However, he never spanked them with a belt or did anything that would have left a mark on either of the children. Defendant stated that on several occasions, he saw Anderson strike the children with a belt. She would "roughly whip" them. He objected to her whipping the children, but she continued to beat them.
Firmin Victor, a defense witness, testified that he knew Anderson from school and from living with her and his girlfriend, Bridges, at Anderson's residence. While he was living there, defendant moved in. Victor moved out around August 1, 1990. According to Victor, there was illegal drug use going on around the residence, and Anderson smoked "weed." However, defendant did not have anything to do with drug dealings at the residence.
*764 Victor testified that he never saw defendant mistreat or abuse Anderson's children, administer any harsh discipline or cruel punishment to them, or "use a belt" on them.
Victor testified that he had seen Anderson "whipping" the children with a belt and with her hand. Victor could not estimate the number of times he saw Anderson beat her children with a belt. Victor further stated that he would not say that Anderson beat them with a belt on a "regular basis" but that when she felt they "acted up" she would "whip them." He would say: "Melanie, don't you think you [sic] being a little too harsh on them?" In response, Anderson would tell him she was their mother and father and that she did not think he had anything to do with the matter.
Defendant testified that the victim had medical problems before Tuesday, September 11, 1990. He recalled that on the preceding Sunday (September 9) Anderson had told him there was blood in the victim's urine. He had no knowledge of any injury that would have caused the victim to have blood in her urine.
Defense witness Crawford testified on direct examination that she saw defendant over the period of Friday, September 7 through Monday, September 10, 1990. She first saw defendant on September 7 at about 7:30 p.m. when he ate dinner at her home in Slidell; they then went to a motel. The next day, defendant brought her home. He stayed over all day, and about 7:00 p.m. that night they went to a restaurant. They left the restaurant at about 9:00 p.m. and then stayed at the motel. On the following day, September 9, they left the motel and stayed at her home. Defendant left that night. Other family members were at Crawford's home over the weekend while defendant was visiting her. On September 10, Crawford first saw defendant at about 7:00 p.m. when he came to her home, where he stayed until about 10:30 or 11:00 p.m.[4]
Defendant testified as to his whereabouts over the period of September 7-10, 1990. He saw Anderson on September 7 when he got home from work and did not see her again until midnight on September 9; he went to Anderson's mobile home on September 8, but found no one home. On the night of September 7, defendant stayed in a motel with Crawford and on the following night, he stayed at the motel again. On September 9, he and Crawford left the motel. Defendant went to Anderson's home that night; Anderson was asleep at the time. On the following night (September 10), defendant was with Crawford until "after twelve."
Defendant testified that on September 11 he awoke shortly after Anderson left to go to work. When defendant was asked if he heard anything unusual before she left, he stated that the children were yelling, crying and running through the house while Anderson was getting dressed; they wanted to go to the baby-sitter. According to defendant, he did not "get completely up" at that time, and went back to sleep. Defendant testified that he heard Anderson leave.
After Anderson left, defendant was awakened by a telephone call from Anderson asking him how the victim was doing. Defendant went back to sleep. Thereafter, the victim's sister awoke defendant and asked him for some cereal. He prepared the cereal for both children, and picked up the victim and put her in a chair; the victim's sister ate, but the victim did not. The victim's sister asked him to turn on the television set and he did. At this point, the victim was conscious. Defendant went back to sleep and was later again awakened by the victim's sister; at that time, defendant noticed that the victim was on the floor. Only one of the victim's eyes was open, and she was hyper-ventilating, *765 i.e., gasping for air. It had been raining heavily that day, and the victim's clothes were wet. Defendant picked up the victim and put her on the couch. Defendant called the victim's name and she did not respond. Defendant then telephoned Anderson.
When Anderson came home, defendant wanted to take the victim to the hospital. Although Anderson disagreed with him, they took the victim to the hospital. Anderson never asked him what had happened to the victim.
Defendant denied having telephoned Anderson to ask her to come home and have sex with him and denied telling the police that he never baby-sat Anderson's children and never hit the children with a belt. Defendant also denied the correctness of Anderson's allegations that he hit the victim with a belt on one occasion and raised the belt to hit her on another occasion.
Defendant testified that he had nothing to do with what happened to the victim. He stated that he was not guilty of the charged offense and did not know what happened to the victim. He acknowledged that he was in charge of Anderson's children when she went to work on September 11, but he had no idea who killed the victim and, particularly, if Anderson killed her.
The evidence in this case amply proved beyond a reasonable doubt that two-year-old Danielle Anderson was the victim of a first degree murder. Thus, the question before us is not whether the evidence was legally sufficient to prove the essential elements of first degree murder but, rather, whether the evidence was legally sufficient to prove defendant's identity as the perpetrator. As noted by defendant, the evidence concerning this requisite element of his identity as the perpetrator was entirely circumstantial. Consequently, we now focus our attention and analysis on the evidence introduced at trial and the inferences which reasonably may be drawn from the evidence as proof that defendant was the perpetrator.
As previously stated, defendant took the witness stand in his own defense, denying that he had any involvement in the instant offense or any knowledge of what had happened to the victim or who had killed her. Implicit in this testimony was an hypothesis of innocence that someone other than himself had committed the murder. The jury's verdict finding defendant guilty as charged indicates that the jury did not accept this testimony as truthful. The jurors reasonably could have inferred that the failure of defendant to tell the truth supported the inference that the truth was unfavorable to him and also showed an awareness of wrongdoing. See State v. Captville, 448 So.2d 676 (La. 1984); State v. Guirlando, 491 So.2d 38 (La. App. 1st Cir.1986). The jury's verdict reflected a reasonable construction of the circumstances relating to the crime based upon the evidence introduced at trial viewed in the light most favorable to the state. When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony (as the jury did here), that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. See State v. Captville, 448 So.2d at 680. Furthermore, in finding defendant guilty, the jury accepted the testimony of the state's witnesses and rejected the defendant's testimony at least insofar as he denied having committed the instant offense. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Gordon, 582 So.2d 285 (La. App. 1st Cir.1991). The credibility of the witnesses' testimony is a matter of weight of the evidence. A determination of the weight to be given evidence is a question of fact for the trier of fact, not subject to appellate review. State v. Tate, 506 So.2d 546 (La. App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
On September 11, 1990, at about 7:00 a.m., Anderson left her home to go to work, leaving the victim and her four-year-old sister[5] *766 alone with defendant. The children were sitting up in bed watching television before Anderson left for work, and Anderson testified that she was not worried about the victim when she left. Defendant admitted that he was at the residence on the morning of September 11. Before Anderson left for work, the children were yelling, crying and running through the house.
On the preceding day, Pinson baby-sat both of the children. She had baby-sat for the children on various occasions over ten months, and only on that day did she notice any indication of injury to the victim, i.e., a mark on the back of the victim's arm that appeared to be a burn. Pinson observed the victim play, watched television with her and did not detect anything unusual concerning the victim's behavior. Nor did the victim complain of any problem. Furthermore, Pinson's testimony that defendant brought the victim to her home for her to baby-sit and picked her up later that day contradicted the testimony of defendant and Crawford that defendant was visiting with her on September 10.
Cobbs, the manager at the store where Anderson was working on September 11, answered the telephone at about 1:30 that day. After the caller identified himself as "Chris," Cobbs had Anderson come to the phone. Anderson talked to defendant, who informed her that the victim was on the floor and barely breathing. After the call, Cobbs observed that Anderson was distraught, crying, shaking and visibly upset. When Anderson got home, the victim was unresponsive and seemed unconscious.
Drs. Harris, McGarry and Liuzza were in agreement that the fatal injuries were caused by the closed head injury to the victim. However, their opinions differed as to the time frame within which the fatal injuries occurred.
Dr. Harris stated that in her opinion, the head injuries had occurred within twenty-four hours of the time she examined the victim (approximately 8:00 p.m. on September 11). Thus, Dr. Harris concluded that these injuries could have occurred as early as 8:00 p.m. on September 10, the day before the victim was taken to Slidell Memorial Hospital.
The opinion of Dr. McGarry, the state's expert witness in the field of forensic pathology and neuropathology who performed the autopsy, was that the victim's fatal head injuries were inflicted within one to two hours of the 2:23 p.m. admission to Slidell Memorial Hospital on September 11.
On the other hand, Dr. Liuzza (the defense expert pathologist) gave an opinion based on the victim's hospital records, Dr. McGarry's autopsy report and the autopsy photographs of the victim. His opinion as to the age of the fatal head injuries reflected that (as of the time the victim was found to have severe brain injury on September 11) the injuries were "anywhere from minutes old to a number of hours, say, ten, twelve hours old, possibly even longer than that. It gets less likely as you go longer."
After viewing all the evidence in the light most favorable to the prosecution, we are convinced that any rational trier of fact could have concluded beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence that defendant committed the first degree murder of Danielle Anderson.
Thus, this assignment of error is meritless.

PATENT SENTENCING ERROR
We have discovered a patent sentencing error. Neither the minutes nor the sentencing transcript show that the trial court, in imposing this sentence, gave the defendant credit for time spent in actual custody prior to sentencing. Such an allowance of credit is mandatory. LSA-C.Cr.P. art. 880. Patent sentencing error occurs when the trial court fails to specify credit for time served. State v. Greer, 572 So.2d 1166 (La.App. 1st Cir.1990). Accordingly, we find patent sentencing error and amend the sentence to reflect that the defendant is to be given credit for time served prior to the imposition of his sentence. See LSA-C.Cr.P. art. 882 A. Resentencing is not required; however, we remand this case and order the district court to amend the commitment and minute entry of the sentence to reflect that *767 the defendant is given credit for time served. See State v. King, 604 So.2d 661 (La.App. 1st Cir.1992).
CONVICTION AND SENTENCE, AS AMENDED, AFFIRMED. REMANDED WITH ORDER.
NOTES
[1] State Exhibit S-16 was a certified copy of the criminal proceeding against Melanie Anderson, which included the transcript of the arraignment proceeding evincing Melanie Anderson's plea agreement under which she pled guilty to one count of cruelty to a juvenile, received a suspended sentence and was placed on five years probation. In exchange, she agreed to testify for the state at defendant's trial and the state agreed to dismiss four other charges pending against her, i.e., three other counts of cruelty to a juvenile and one count of contributing to the delinquency of a juvenile.
[2] The record reflects that, immediately prior to the recess, the prosecutor had begun a line of questioning directed at establishing a foundation for the witness' impeachment. The paragraph of this opinion in which footnote 4 appears summarizes trial testimony given by Tracy Crawford during her direct examination which precipitated the impeachment; footnote 4 discusses the basis on which the prosecution impeached Tracy's credibility. Karen Crawford's testimony at the hearing on the motion for new trial indicated that, if she had not declined to testify at defendant's trial, she would have given testimony corroborative to that given by Tracy concerning defendant's whereabouts on September 7-10, 1990.
[3] The record reflects that the state had given written pretrial notice of its intent to introduce the other crimes evidence set forth in the above paragraph. The notice stated that the evidence was to establish defendant's "intent, preparation, knowledge, guilty knowledge, lack of accident or mistake, systematic pattern of behavior and motive." At a pretrial hearing to determine the admissibility of the evidence, the trial court ruled the evidence would be admissible.

The record further reflects that, immediately after the state presented Anderson's testimony as to the other crimes evidence, the trial court gave a limiting instruction to the jury that the evidence was to be considered for the sole purpose of determining the existence of intent, mistake or accident and not to find defendant guilty of the charged offense merely because he may have committed another offense or other offenses.
[4] On cross-examination, the prosecutor successfully impeached Crawford's credibility through a line of questioning concerning specific hours she allegedly worked on September 7-10, 1990, as reflected on documents of Crawford's employer, Ryan's Steak House, located in Slidell. On redirect examination, Crawford stated that it was possible that she was mistaken about the time she spent with defendant on the weekend of September 7-9. She stated that it was possible she could have worked part of that weekend, but she also stated that the work records of her employer were incorrect. Later, during the state's case in rebuttal, the state presented the testimony of the manager of the restaurant where Crawford worked to establish the foundation for the documentary evidence of Crawford's work hours, which it then introduced in evidence.
[5] At trial, a hearing was held outside the presence of the jury for the purpose of determining the competency of the four-year-old sister to testify as a witness for the state. Following extensive questioning of the child by the state, the defense and the trial court, the trial court ruled that the child lacked sufficient understanding and would not be permitted to testify.