831 So.2d 503 (2002)
STATE of Louisiana
v.
John TRACY.
No. 02-KA-0227.
Court of Appeal of Louisiana, Fifth Circuit.
October 29, 2002.
*504 Martin E. Regan, Jr., Kris A. Moe, New Orleans, LA, for Appellant.
Anthony G. Falterman, District Attorney, Donald D. Candell, Assistant District Attorney, Gonzales, LA, for Appellee.
*505 Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendant/Appellant, John Tracy, appeals his conviction and sentence for illegal felony gambling. For the following reasons, we affirm.
On May 19, 1999, the St. James Parish District Attorney filed a bill of information charging defendant, John Tracy, with felony illegal gambling, a violation of LSA-R.S. 14:90(A)(2), which occurred on or about October 24, 1998. Tracy was arraigned and pled not guilty on July 12, 1999. On June 20, 2000, the bill of information was amended to reflect that the date of occurrence was between September 1, 1997, and October 24, 1998. Tracy was re-arraigned on the amended bill and pled not guilty.
On June 20, 21, and 22, 2000, the case was tried before a six-person jury, which unanimously found Tracy guilty as charged. Tracy filed a Motion For New Trial on March 6, 2001, which was denied on March 21, 2001. On April 3, 2001, the trial court sentenced Tracy to imprisonment at hard labor for three years, suspended. Tracy was ordered to serve six months in the parish jail, and, thereafter, would be placed on supervised probation for two years. In addition, the trial court fined Tracy $20,000. On April 6, 2001, Tracy filed the present motion of appeal, which the trial court granted.
The following facts were elicited at trial:
Sergeant Ernest Brewer of the Baton Rouge City Police, who was called as a witness by the state, testified that, in 1997 and 1998, he engaged in undercover work involving illegal gambling. The investigation centered on a house located at 2164 Main Street in Lutcher, Louisiana, in St. James Parish, also known as the "gambling house." Sergeant Brewer, using his undercover name "Jason," first went to the gambling house on October 18, 1997, and, on that date, defendant, John Tracy, told Sergeant Brewer that he was the owner of the house. Sergeant Brewer went to the house many times thereafter to either place bets or collect winnings. Brewer eventually began running football cards for Tracy,[1] and observed other people placing bets and collecting winnings; he also watched other runners picking up football cards and being paid winnings on the cards as well. Many of Brewers' visits were videotaped.
Sergeant Brewer testified that he returned to the gambling house on October 20, 21, 27, and 28, 1997; November 4, 1997; December 23, 1997; September 1, 8, 12, 15, 22, and 29, 1998; and October 6, 13, 20, and 24, 1998. Brewer further testified that, on these dates, he encountered many people who were working for Tracy and were involved in the operation of his gambling business, including: Lonnie Jasonville, Gerald Jasonville, Mr. Thibodaux, Mr. Clark, Mr. Hatch, Kenneth Johnson, and other unnamed persons. Several of these witnesses, and others, testified at trial regarding their involvement with Tracy's gambling business.
Sergeant Lynn Calamia of the Louisiana State Police, who was called as a witness by the state, testified that he assisted in *506 the gambling investigation involving Tracy, and collected evidence turned over to him by Sergeant Brewer. Sergeant Calamia's involvement in the case ended in December of 1997 when he was transferred to a new assignment. Calamia's successor on the case was Detective Emery Tumulty.
Sergeant Emery Tumulty of the Louisiana State Police, called as a witness by the state, testified that he assisted in the gambling investigation involving Tracy. He testified that Tracy was arrested, that search warrants were executed on Tracy's house and vehicle, and that items were seized, including: bank bags, football cards, receipts, stubs, $3,500 in one-dollar bills, other cash, wagers, a log, names and numbers, sports schedules, football information, statistics, bookmaking records, tally sheets, Hibernia Bank envelopes, line sheets, a list of runners, a template for making cards, and cell phone records. Sergeant Tumulty further testified that 13 individuals were arrested as result of the investigation, and that he had made recommendations to the district attorney's office regarding how he wanted to see the 13 individuals prosecuted. He identified a few individuals who were minor participants, and stated that he did not want to see them charged with felonies. Tumulty wanted to see Tracy charged with felony gambling, however.
Charles Clark, who was called as a witness by the state, testified that he had known Tracy for approximately nine years, that he was in the printing business, and that he had printed football gambling cards for Tracy for three or four years. Mr. Clark stated that, as a result of his printing football cards for defendant, he was arrested; Clark further testified that he pled guilty to misdemeanor gambling as a result of that arrest. As part of the plea agreement, Mr. Clark agreed to testify regarding his involvement with Tracy. Clark also delivered football cards for Tracy to three locations: the tire sales and repair shop in Lutcher, a residence in Lutcher, located on the same street as the tire shop, and a place in Houma. He stated that he brought 4000 to 5000 cards a week to Tracy.
Shelby Oubre, who was called as a witness by the state, testified that he was the owner of Lutcher Tire and Alignment in Lutcher. Mr. Oubre testified that he knew Tracy due to Tracy's gambling operation, and that the relationship had started approximately four years prior; Oubre stated that as a result of that relationship with Tracy, he was arrested. Oubre disclosed that in return for a guilty plea to misdemeanor gambling, he agreed to testify against Tracy.
Mr. Oubre testified that Tracy provided him with the lines or point spreads, and that Tracy would tell him how to put the lines out. Mr. Oubre received stacks of cards from Tracy on a regular basis. When Mr. Oubre would send these cards out, people would play them and Mr. Oubre would collect money. Mr. Oubre would then take 25 percent, and Tracy would take the rest. Oubre testified that he was working together with Charles Brock and Danny Veron, a/k/a Polo, at Lutcher Tire and Alignment to conduct the operation for Tracy. He admitted that before he worked for Tracy, he ran his own gambling operation for two years. Mr. Oubre denied that the only reason he got a misdemeanor in this case was because he knew the district attorney and the sheriff. Mr. Oubre stated that everyone, including defendant, was offered a misdemeanor in this case and that some chose to take it and others did not.
Charles Brock, who was called as a witness by the state, testified that he had known Tracy for approximately 12 years, and that he had conducted part of Tracy's *507 gambling operation. The money Brock collected as bets went to Tracy. In return, Brock got a percentage of the bets. Brock stated at trial that as a result of his involvement with Tracy, he got arrested and pled guilty to misdemeanor gambling. Brock agreed to testify against Tracy as a result of receiving that plea. Mr. Brock worked at Lutcher Tire and Alignment with Mr. Oubre in conducting the business.
Daniel Veron, who was called as a witness by the state, testified that he knew Tracy, and "ran cards" with Mr. Oubre and Mr. Brock for him. Mr. Veron testified that in return for running cards, he got a commission of 25 percent. The remainder of the money went to Tracy. It was Veron's responsibility to manage and keep all of the books as the bets came in. He was arrested as a result of his involvement with the gambling operation, and he pled guilty to misdemeanor gambling.
Gerald Jumonville, who was called as a witness by the state, testified that he knew Tracy, and that he and his brother, Lonnie, had run cards for him for one year. He and his brother got 25 percent for their role, and the remainder of the money went to Tracy. Gerald Jumonville testified that he would pick up the cards from a man named Thibodaux in Lutcher, Louisiana. Gerald Jumonville got arrested as a result of his association with Tracy and pled guilty to misdemeanor gambling.
On appeal, Tracy has raised issues regarding sufficiency of the evidence and the denial of a motion for new trial. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted.[2] If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless.[3]

LAW AND ANALYSIS
In his first assignment of error, Tracy contends that the evidence presented at trial was legally insufficient to convict him. Specifically, Tracy argues that the state failed to show that five persons were involved who conducted, financed, managed, supervised, directed or owned all or part of an illegal gambling business, as mandated by LSA-R.S. 14:90(A)(2)(b). Tracy also contends that the state failed to show a network of action between the independent conduct of defendant and others to create a common business, thus placing defendant within the scope of LSA-R.S. 14:90(A)(2).
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia,[4] requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the *508 elements of the crime in the light most favorable to the prosecution, to find the essential elements of the offense were proven beyond a reasonable doubt.[5]
In a case involving circumstantial evidence, LSA-R.S. 15:438 provides that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."[6] Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt.[7]
Tracy was convicted of felony illegal gambling, a violation of LSA-R.S. 14:90(A)(2), which provides, in pertinent part:
§ 90. Gambling
A. (1)(a) Gambling is the intentional conducting, or directly assisting in the conducting, as a business, of any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit.
(b) Whoever commits the crime of gambling shall be fined not more than five hundred dollars, or imprisoned for not more than six months, or both.
(2) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than twenty thousand dollars, or imprisoned with or without hard labor, for not more than five years, or both when:
(a) R.S. 14:90 is violated.
(b) Five or more persons are involved who conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business.
(c) Such business has been in or remains in substantially continuous operation for a period of thirty days or more or, if the continuous operation is for less than thirty days, has a gross revenue of two thousand dollars in any single day.
Defendant correctly argues that there are no reported cases of convictions under LSA-R.S. 14:90 to define the crime of conducting an illegal gambling business by five or more persons, and penalties. Tracy also correctly contends that the statute appears to have been patterned after its federal counterpart, 18 U.S.C.A. § 1955, which provides:
§ 1955. Prohibition of illegal gambling businesses
(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
(b) As used in this section
(1) "illegal gambling business" means a gambling business which
(i) is a violation of the law of a State or political subdivision in which it is conducted;
(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $ 2,000 in any single day.

*509 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $ 2,000 in any single day shall be deemed to have been established.
In one case pertaining to 18 U.S.C.A. § 1955, Sanabria v. United States,[8] the U.S. Supreme Court recognized the term "conduct" to be "any degree of participation in an illegal gambling business except participation as a mere bettor."
In the instant case, in order for the state to prove that LSA-R.S. 14:90(A)(2) was violated, it was not only necessary to show that there was a gambling operation in violation of state law, but that it was conducted, financed, managed, supervised, directed, or owned by at least five people and that it operated substantially and continuously for at least 30 days or had more than $2000 gross revenue in any single day.[9] Tracy argues on appeal only that the evidence was insufficient to prove that the gambling business involved five or more persons who conducted, financed, managed, supervised, directed, or owned all or part of an illegal gambling business as required by LSA-R.S. 14:90(A)(2)(b).
The record reflects that, at trial, Sergeant Brewer testified that he acted as an undercover officer in a gambling investigation, which centered on a "gambling house" located at 2164 Main Street in Lutcher, Louisiana. On October 18, 1997, Tracy told Sergeant Brewer that he owned the house. Sergeant Brewer went to the house many times to either place bets or collect winnings and eventually began running cards for Tracy. Sergeant Brewer went to the gambling house on October 20, 21, 27, and 28, 1997; November 4, 1997; December 23, 1997; September 1, 8, 12, 15, 22, and 29, 1998; and October 6, 13, 20, and 24, 1998. Sergeant Brewer further testified that, on these dates, he encountered many people who were involved in the operation of defendant's gambling business, including, Lonnie Jumonville, Gerald Jumonville, Mr. Thibodaux, Mr. Clark, Mr. Hatch, Kenneth Johnson, and other unnamed persons. Several of these witnesses, and others, testified regarding their involvement with defendant's gambling business.
Mr. Clark testified that he had printed the football cards used in defendant's gambling business for three or four years. He admitted to delivering 4000 to 5000 of these cards a week to Tracy. Shelly Oubre testified that he knew Tracy from the gambling operation, and that the relationship with him had started approximately four years prior. Mr. Oubre testified that Tracy provided him with lines, and that defendant would tell him how to put the lines out. He stated that he received stacks of cards from Tracy on a regular basis, and that he would send the cards out, people would play them, and he would *510 collect money. Mr. Oubre testified that he would deduct 25 percent from the collections, and Tracy would get the rest. Mr. Oubre further testified that he was working with Charles Brock and Danny Veron at Lutcher Tire and Alignment to conduct the operation for defendant.
Mr. Brock testified that he conducted part of the gambling operation Tracy was running. He stated that the money he collected as bets went to Tracy, and in return, Mr. Brock got a percentage of the bets. Brock further testified that he conducted the gambling business at Lutcher Tire and Alignment. Mr. Veron testified that he ran cards with Mr. Oubre and Mr. Brock for defendant, and in return, Mr. Veron got a commission of 25 percent. Mr. Veron further testified that it was his responsibility to manage and keep all of the books as the bets came in. Mr. Jumonville (Gerald) testified that he and his brother, Lonnie, ran cards for Tracy for one year, that they got 25 percent commission for their efforts, and that the remainder of the money went to defendant. Mr. Jumonville testified that he would pick up the football cards from a man named Thibodaux in Lutcher.
The evidence above reflects that the state proved beyond a reasonable doubt that defendant conducted, financed, managed, supervised, directed, or owned all or part of an illegal gambling business. The testimony of undercover officer, Sergeant Brewer, and the testimony of the runners and the printer, clearly established that defendant was a bookmaker who took bets on sporting events. The evidence further shows that defendant employed numerous runners who obtained football cards from defendant, passed them out to individuals, took bets from them along with their money, deducted a commission from the collections and gave the rest of the money to defendant. As such, the state proved the first element of the statute.
Secondly, it appears that the state proved beyond a reasonable doubt that five or more persons were involved who conducted, financed, managed, supervised, directed, or owned all or part of an illegal gambling business. Clearly, Mr. Clark, Mr. Oubre, Mr. Brock, Mr. Veron and Mr. Jumonville (Gerald), all of whom testified against defendant at trial in exchange for plea agreements, were very involved in the operation of defendant's gambling business. They were participants in the business, and their actions were also necessary and helpful to the business. Mr. Clark printed and delivered the football cards used for betting purposes, and Mr. Oubre, Mr. Brock, Mr. Veron and Mr. Jumonville (Gerald), among others, were bookmakers, in that they obtained football cards from Tracy, took bets from individuals, were paid a commission on all collections, and delivered the remainder of the money to Tracy.
Finally, it appears that the state proved beyond a reasonable doubt that the illegal gambling business had been in or remained in substantially continuous operation for a period of 30 days or more. LSA-R.S. 14:90(A)(2)(b)(c). Tracy does not argue on appeal that the state failed to do so. Sergeant Brewer testified, without contradiction, that the gambling house was in operation continuously from September through December of 1997, and from September 1, 1998 through October 24, 1998. Further, the testimony of the runners and the printer regarding the length of time they worked for defendant reflects that the operation was substantially continuous. Therefore, the state proved the third element of the statute, i.e., that the gambling business was in substantially continuous operation for a period of 30 days. Since the state proved that the gambling business *511 was in substantial continuous operation for 30 days or more, it was not necessary for them to prove that the business had a gross revenue of $2,000 in any single day, as per LSA-R.S. 14:90(A)(2)(c).
Based on the foregoing we find this first assignment to be without merit.
In his second assignment of error, Tracy contends that the trial court erred in denying his Motion For A New Trial, which alleged that several jurors had talked with witnesses during trial, and that one of them, Shelby Oubre, had referred to a pretrial deal that defendant had been offered and refused, and to Tracy's former conviction. Tracy also argues that the trial court erred in failing to hold an evidentiary hearing on this issue.
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded.[10] LSA-C.Cr.P. art. 851 sets forth the law regarding the grounds for a motion for new trial in pertinent part:
The court, on motion of the defendant, shall grant a new trial whenever:
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
LSA-C.Cr.P. art. 854 sets forth the necessary allegations when a motion for new trial is based on newly discovered evidence:
A motion for a new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:
(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;
(2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
(3) The facts which the witnesses or evidence will establish; and
(4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.
The newly discovered whereabouts or residence of a witness do not constitute newly discovered evidence.
LSA-C.Cr.P. art. 855 sets forth the necessary allegations when a motion for new trial is based on prejudicial error or defect in the proceedings:
A motion for a new trial based on ground (4) of Article 851 shall contain allegations of fact sworn to by the defendant or his counsel, showing:
(1) The specific nature of the error or defect complained of; and
(2) That, notwithstanding the exercise of reasonable diligence by the defense, *512 the error or defect was not discovered before or during the trial.
The ruling on a motion for new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only where there is a clear showing of abuse of that discretion.[11]
The record shows that Tracy filed a Motion For New Trial on March 6, 2001 arguing that the jury venire, as well as the actual jury, were exposed before and during trial to highly prejudicial remarks about Tracy made by state's witnesses in the courthouse hallway. On March 15, 2001, Tracy filed a supplemental Motion For New Trial based on LSA-C.Cr.P. arts. 851 and 853. In his Memorandum In Support Of The Motion For New Trial, Tracy argued that he was entitled to a new trial based on LSA-C.Cr.P. art. 851(4) regarding prejudicial error or defect in the proceedings not discovered before the verdict. Tracy contends that the jurors, in spite of being instructed by the trial judge not to co-mingle with one another and not to discuss the case until told to do so, were talking with one another and socializing in the area outside the courtroom on the second floor during breaks. Tracy claims that the jurors were not sequestered, but those who were smokers were smoking alongside state's witnesses who were discussing the case. Tracy contends that these jurors were exposed to information that he had a prior felony conviction and had been offered a plea bargain, which he should have accepted.
Tracy attached three affidavits to the Motion For New Trial from Charles Clark, Ronald Lee Smith, and Albert Eli Johnson. Mr. Clark stated in an affidavit dated February 26, 2001 that he was a witness at trial, that he was instructed by the trial judge not to co-mingle with others during trial,[12] that he was seated in the hallway outside the courtroom with his wife, that jurors were present in the hallway, that witness, Shelby Oubre, spoke loudly to other witnesses in close proximity to the jurors, and that Mr. Clark's wife heard Mr. Oubre telling Mr. Clark what was happening in the courtroom.
Ronald Lee Smith stated in an affidavit dated February 5, 2001 that: he was present at defendant's trial;[13] that he was inside and outside the courtroom during trial; that he witnessed jurors talking with state witnesses outside the courtroom; that Mr. Oubre told Mr. Smith that defendant should have taken the plea bargain that Mr. Oubre and the other witnesses took because he had a prior conviction for gambling in Mississippi, and that defendant was trying to beat the system, and; that jurors were close enough to hear Mr. Oubre because Mr. Oubre was speaking loudly.
Albert Eli Johnson, in an affidavit dated February 5, 2001, stated: that he was present at defendant's trial[14]; that he was present inside the courthouse and courtroom during jury selection; that he was present in the general public area outside the courtroom; that he recognized jurors, that he witnessed jurors mingling with state's witnesses during breaks, and; that Mr. Oubre stated in the presence of jurors *513 that defendant was a convicted felon from Mississippi.
On March 21, 2001, the trial judge denied Tracy's Motion For New Trial and supplemental Motion For New Trial with written reasons. The court concluded, in a lengthy analysis, that the motions were procedurally deficient and lacked merit. The court also found that any exposure to prejudicial remarks prior to trial should have been discussed and remedied by defense counsel during voir dire. It stated that the memorandum in support of the motions assumed incorrectly that the trial jurors were sequestered during trial and were ordered not to co-mingle, when, in fact, the jury was only sequestered during deliberations. The court continued by stating that the jurors were twice instructed concerning their actions during trial, i.e., they were told not to permit anyone to discuss the case in their presence and if that occurred, to report it. The three affidavits were executed eight months after trial; therefore, the court concluded that if the affiants were available to the defense in February of 2001, then they were equally available during trial.
The court gave further reasons for the denial of the Motion For New Trial, stating that there was no assurance that a timely complaint would have resulted in a mistrial. The court determined that since Mr. Oubre was not a judge, district attorney or court official, LSA-C.Cr.P. art. 770 would not apply, finding that the applicable articles would be LSA-C.Cr.P. arts. 771 and 775, which could have resulted in an admonition. The court stated that even in an Article 770 situation, timely objection and reasonable diligence both apply. The court found that since Mr. Oubre testified in court, without objection, that defendant could have received the same misdemeanor plea, then the potential prejudice only involved an out-of-court reference to an unspecified Mississippi conviction, and that there was no assurance that this would not have resulted in an admonition.[15]
In his brief, Tracy takes issue with several of the court's findings. First, he claims that the grounds were stated in his Motion For New Trial as prejudicial error or defect in the proceedings not discovered before the verdict, pursuant to LSA-C.Cr.P. art. 851(4). Second, Tracy argues that LSA-C.Cr.P. art. 854 refers to newly discovered evidence and not prejudicial error, so that the requirements of LSA-C.Cr.P. art. 854 were inapplicable. Tracy further contends that the trial court abused its discretion in denying the Motion For New Trial, and requests that this Court remand the case for an evidentiary hearing to determine what effect Mr. Oubre's comments had on the jurors.
In the instant case, on two occasions during trial, the trial judge addressed the issue of jury contact. On the first occasion, the following exchange occurred between defense counsel and the trial judge:
MR. WAGUESPACK: [Defense counsel]
Your honor, there has been a man in and out of this courtroom who has been talking to sequestered witnesses and to Ms. Trosclair, a juror. I don't know him, but Gary can point him out to you. But I think we need tocan we take a *514 minute to identify this individual, Your Honor?
THE COURT:
Yes.
MR. WAGUESPACK:
Whoever he was, Judge, he left, so I don't think it's a problem.
Another time, the trial judge stated:
Ladies and Gentlemen of the Jury, you might have noticed that this is not an ideal place with this many witnesses around the building and you being a juror and so forth. We are trying to make some kind of arrangements so we don't have the jurors around as such, but at the breaks from here on out the bailiff will show you what will eventually be the jury room, where you can retire when you leave here, so there won't be that much contact with the witnesses out in the hall. If any of you need to smoke, the bailiff will show you where you can smoke other than on the front porch. We will try to convenience you that way.
After a review of the record, we find that the trial court was correct in that defendant's original and supplemental motions for new trial were procedurally deficient. The supplemental Motion For New Trial was not filed with permission of the court as required by LSA-C.Cr.P. art. 856. Neither motion contains allegations that, notwithstanding reasonable diligence, the error or defect was not discovered before or during the trial.[16] The original motion did not contain the specific nature of the error or defect complained of.[17] Defendant correctly notes, however, that his motion was based on LSA-C.Cr.P. art. 851(4) and not art. 851(3) and, therefore, he did not have to comply with LSA-C.Cr.P. art. 854, which requires the listing of witnesses who will testify, the facts they would establish, and a showing that the witnesses were not beyond the process of the court.[18]
With respect to the merits of the motions, the record reflects that defendant was on notice during trial that there had been possible contact between witnesses and jurors. The first time this occurred, defendant told the judge about his concerns regarding this issue, but then stated, "I don't think it's a problem." The statements by the trial judge on the second occasion further indicate that there may have been contact between the witnesses and jurors outside the courtroom. Defendant did not object, move for a mistrial, ask for an admonishment, or request a hearing to determine the possible effect, if any, of this alleged contact. Therefore, it does not appear that Tracy used reasonable diligence to discover the alleged error or defect during trial. Had Tracy brought this matter to the attention of the court during trial when he first had notice of it, the trial judge might possibly have declared a mistrial, admonished the jury to disregard statements outside of the courtroom, or held a hearing to determine whether the jurors had been affected by the contact with witnesses and/or others outside of the courtroom.
Additionally, based upon the evidence presented, we find that defendant has failed to show that he suffered any prejudice *515 as a result of the alleged contact between jurors and witnesses.[19] Under LSA-C.Cr.P. art. 851(4), the error or defect must be prejudicial to the defendant before a new trial can be granted. There has been no such showing. Tracy argues that the jurors overheard statements outside the courtroom regarding defendant's refusal to accept a plea agreement and defendant's prior conviction, but Mr. Oubre testified at trial that Tracy was offered a plea agreement but chose not to take it. Because this statement was elicited at trial, it would not have been prejudicial to the defendant even if the jurors had overheard this statement outside the courtroom.[20] With respect to defendant's prior conviction, even if the jurors had overheard this statement outside the courtroom, it appears that the error was harmless considering the overwhelming other evidence against defendant, as was discussed above in assignment of error number one.
Further, the jurors were instructed by the trial judge at the beginning of trial that, although they were not required to remain together while the court was in recess, they must not discuss the case among themselves or with anyone else, and they should not permit any person to discuss the case in their presence. The jury was also advised that if anyone did discuss the case in their presence, despite the jurors telling them not to, they should report that fact to the court as soon as possible. Since it appears that no juror reported to the trial judge that a witness or someone else discussed the case in their presence outside the courtroom, it is reasonable to conclude that the jurors did not overhear anything allegedly said outside the courtroom.
Based on the foregoing, we find the trial judge did not abuse his discretion in denying defendant's Motion For New Trial or in failing to conduct an evidentiary hearing.
In his final assignment of error, Tracy asserts that the trial court erred in imposing an excessive sentence.
The trial court sentenced Tracy to imprisonment at hard labor for three years, suspended, and ordered him to serve six months in the parish jail. Thereafter, Tracy would be placed on supervised probation for two years. In addition, the trial court imposed a $20,000 fine. Tracy contends the sentence is constitutionally excessive because he is a first offender and a devoted family man with a clean record and ties to the community, who was singled out by the court for the imposition of the maximum sentence for his leadership role in the bookmaking operation. Tracy further argues that the court had the incorrect perception that he had or would succumb to organized crime. Tracy claims that the other 13 defendants who pled guilty received misdemeanor charges, probation and fines, and that his sentence is disproportionate to his conduct.
We note that Tracy failed to file a Motion To Reconsider Sentence, and that he failed to orally object to the sentence after it was imposed. LSA-C.Cr.P. art. 881.1 provides that a defendant may file a motion to reconsider sentence within 30 days of sentencing, but requires that the motion be made orally at the time of sentencing, or in writing, and that it set forth the specific grounds on which the motion is based. The failure to file a motion to reconsider sentence, or to state the specific grounds on which the motion is based, precludes a defendant from raising those *516 grounds on appeal.[21] However, in these circumstances this Court has generally considered the issue of whether the sentence was constitutionally excessive.
The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.[22] The trial judge has wide discretion in imposing sentences within the statutory limits, and sentences will not be set aside absent manifest abuse of that broad discretion.[23] Three factors are considered in reviewing a judge's sentencing discretion: (1) the nature of the crime; (2) the nature and background of the offender; and (3) the sentence imposed for similar crimes by the same court and other courts.[24] There is no requirement that specific matters be given any particular weight at sentencing.[25]
Tracy was convicted of felony illegal gambling, a violation of LSA-R.S. 14:90(A)(2). Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000, or imprisoned with or without hard labor, for not more than five years, or both.[26]
Prior to sentencing, the trial judge stated that the presentence investigation report recommended the intensive incarceration, intensive parole program as per LAS-R.S. 15:574.4(C); however, Tracy's age, 49, made him ineligible for that program. The trial court continued, stating that it had read and considered 19 different favorable letters attached to the presentence investigation report; that Tracy had no juvenile or adult convictions presently of record; and that the court noted probation and parole's recommendation due to the seriousness of the charge. In formulating the sentence, the trial court considered the following aggravating conditions: number 7, subsequent to the offense, defendant allowed another to use relegation threats with intent to influence the institution or conduct at criminal proceedings; number 9, the offense resulted in significant economic loss to some victims;[27] number 13, the offender was a leader and his violation was in concert with one or more persons to whom the offender occupied the position of organizer, a supervisory position, or another position of management; that defendant did not act under provocation sufficient to justify his action, *517 other than his greed for short-term profits; that Tracy had substantial, legitimate income; and that the district attorney's office and the sheriff's office recommended incarceration. The trial court also considered the following mitigating circumstances: the victims of Tracy's criminal conduct facilitated its commission; number 27, Tracy had no reported history of prior delinquency or criminal activity, had led a law-abiding life for a substantial period of time before the commission of the instant crime, according to the letters; number 31, the imprisonment of Tracy for an extended period of time would entail an excessive hardship on his dependent, three-year-old daughter who had severe health problems; and number 32, the court had scant sentencing guidelines due to the fact that there had not been one reported appellate case of felony gambling in Louisiana since the early 1940's. The trial judge also provided written reasons for sentence, which summarized the above oral reasons given in court.
Prior to sentencing, the trial judge considered at length all of the mitigating and aggravating factors including, but not limited to, defendant's age, background, the nature of the crime, family situation, letters of recommendation, the presentence investigation report and lack of a criminal record. Tracy received a mid-range sentence, three years, with two and one-half years suspended, and six months of imprisonment at hard labor. He did not get the maximum sentence of five years, and he was ordered to serve only six months in prison. Although the trial court ordered defendant to pay the maximum fine of $20,000, it does not appear that fine is excessive under the facts of the case. Tracy ran a large bookmaking operation and apparently was making a great deal of money. Although Tracy is correct in that there was no evidence that defendant had, or would, succumb to organized crime, it does not appear that the trial judge abused his discretion in contemplating the possible consequences of defendant's criminal actions. The sentence is not grossly disproportionate to the offense nor does it impose needless and purposeless pain and suffering.
Based on the foregoing, we find that the sentence imposed upon Tracy by the trial court was not constitutionally excessive, and therefore consider this assignment to be without merit.
The record was reviewed for errors patent, according to LSA C.Cr.P. art. 920; State v. Oliveaux,[28] and State v. Weiland.[29] The review reveals no errors patent in this case.
Accordingly, based on the foregoing, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Sergeant Brewer explained that "running cards" meant that a person takes cards which lists upcoming football games and gives them to individuals. The individuals receiving the cards indicate which teams they think will win and give that person money for bets on those teams. The person handing out the cards and receiving the money then takes the money back to the bookmaker or bookie. The bookmaker or bookie, in this case, Tracy, then gave the person 25 percent of the collections for running the cards.
[2] State v. Hearold, 603 So.2d 731, 734 (La. 1992); State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 834.
[3] State v. Alexis, 98-1145 (La.App. 5 Cir. 6/1/99), 738 So.2d 57, 64, writ denied, 99-1937 (La.10/13/00), 770 So.2d 339.
[4] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[5] State v. Evans, 00-1766, p. 3 (La.App. 5 Cir. 4/11/01), 786 So.2d 781, 783, writ denied, 01-1390 (La.4/12/02), 812 So.2d 664.
[6] State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675; writ denied, 99-2057 (La.1/24/00), 753 So.2d 208.
[7] State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
[8] 437 U.S. 54, 70-71, 98 S.Ct. 2170, 57 L.Ed.2d 43, n. 26, (1978).
[9] LAS-R.S. 14:90(A)(2)(b)(c).
[10] LAS-C.Cr.P. art. 851.
[11] State v. Battie, 98-1296 (La.App. 5 Cir. 5/19/99), 735 So.2d 844.
[12] The affidavit does not indicate exactly whom he was not to co-mingle with.
[13] The affidavit does not indicate why Mr. Smith was present at the trial. He was not a witness, and the record reflects he was not a juror.
[14] The affidavit does not indicate why Mr. Johnson was present at the trial. He was not a witness, and the record reflects he was not a juror.
[15] The court cited several cases in support of its decision: State v. McCants, 93-1703 (La. App. 1 Cir. 10/7/94), 644 So.2d 752; State v. Maize, 94-0736 (La.App. 1 Cir. 5/5/95), 655 So.2d 500, writ denied, 95-1894 (La.12/15/95), 664 So.2d 451; State v. Arvie, 482 So.2d 1083 (La.App. 3 Cir.1986), writ granted, 487 So.2d 432 (La.1986), affd, 505 So.2d 44 (La.1987); State v. Bean, 582 So.2d 947 (La.App. 2 Cir. 1991), writ denied, 586 So.2d 567 (La.1991); and State v. Armstrong, 32-279 (La.App. 2 Cir. 9/22/99), 743 So.2d 284, writ denied, 99-3151 (La.04/07/00), 759 So.2d 92.
[16] LAS-C.Cr.P. art. 855.
[17] LAS-C.Cr.P. art. 855.
[18] It is noted that there was no contradictory hearing on the Motion For New Trial. Although LAS-C.Cr.P. art. 852 requires contradictory trial of motions for new trial, "historically the method of hearing motions for new trial has been left to the trial judge's discretion." State v. Davis, 00-278 (La.App. 5 Cir. 8/29/00), 768 So.2d 201, 208, writ denied, 00-2730 (La.8/31/01), 795 So.2d 1205 (citing State v. Jackson, 570 So.2d 227, 231 (La.App. 5 Cir.1990)).
[19] LAS-C.Cr.P. art. 851(4); McCants, supra; Arvie, supra; Bean, supra.
[20] Bean, supra.
[21] State v. Richardson, 01-239 (La.App. 5 Cir. 6/27/01), 790 So.2d 717, 718 (citing State v. Mims, 619 So.2d 1059, 1060 (La.1993); State v. Holmes, 94-907 (La.App. 5 Cir. 3/15/95), 653 So.2d 642, 646).
[22] State v. Lobato, 603 So.2d 739, 751 (La. 1992); State v. Munoz, 575 So.2d 848, 851 (La.App. 5 Cir.1991), writ denied, 577 So.2d 1009 (La.1991).
[23] State v. Rainey, 98-436 (La.App. 5 Cir. 11/25/98), 722 So.2d 1097, 1106, writ denied, 98-3219 (La.05/07/99), 741 So.2d 28.
[24] State v. Le, 98-1274 (La.App. 5 Cir. 6/30/99), 738 So.2d 168, 171, writ denied, 00-2174 (La.4/12/01), 789 So.2d 587.
[25] State v. Jones, 33,111 (La.App. 2 Cir. 3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385.
[26] LAS-R.S. 14:90(A)(2).
[27] The trial judge added that most people who play football cards lose; that this puts money in the pocket of the "little big man" operator and runners; that when a big hit occurs, the "little big man operative" has no choice but to go to "big time gamblers," more accurately defined as organized crime, to bail him out and pay off the big hit; and that the little big man and his runners then become pawns of the big time gamblers who take over the operation.
[28] 312 So.2d 337 (La.1975).
[29] 556 So.2d 175 (La.App. 5 Cir.1990).