875 So.2d 908 (2004)
STATE of Louisiana
v.
Stanley ONSTEAD.
No. 03-KA-1413.
Court of Appeal of Louisiana, Fifth Circuit.
May 26, 2004.
*910 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Cameron M. Mary, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Ralph S. Whalen, New Orleans, LA, for Defendant/Appellant.
MARION F. EDWARDS, Judge.
Defendant, Stanley Onstead, appeals his conviction for molestation of a juvenile over whom he had supervision or control, in violation of LSA-R.S. 14:81.2. Olmstead pled not guilty at arraignment, and after a bench trial on May 1, 2002, the trial judge found him guilty as charged.
According to nine-year-old J.M.'s trial testimony, Onstead touched her inappropriately and compelled her to touch him inappropriately while she was at his house. J.M. testified that "Mr. Stan," (Onstead) lived near her home, and that she, her sister, Melissa, her brother, Billy, and some of their friends frequently visited Onstead, who was 55 years old at the time of trial. J.M. stated that Onstead provided art supplies for the children to use at his house. While there, J.M. and the other children also made popcorn, ate cereal, and watched television. The children played on Onstead's computer, which had several children's games. Onstead bought J.M. art supplies, toys, and clothing. According to J.M., while Onstead also purchased some things for Billy and Melissa, J.M. always received more. In addition, Onstead purchased memberships for the children at Elmwood Fitness Center, where J.M. participated in gymnastics, also at Onstead's expense. Onstead brought J.M. and the other children to Elmwood, where he videotaped J.M. during gymnastics.
J.M. said that the other children were not allowed to go upstairs at Onstead's house, but Onstead occasionally took her upstairs. J.M. testified that Onstead would show her some clothing, money, and toys that his mother and brother had given him. Further, J.M. said that Onstead told her not to look when he dressed, and she said she did not.
According to J.M., Onstead touched her breasts, her vagina, and her "butt" while downstairs in the back room of his home, where he kept his computer, or in the living room, where the television was located. J.M. said this touching happened "[a] lot." J.M. said that, when she was sitting on Onstead's lap, he would start "digging underneath" her clothing. According to J.M., Onstead touched her under and on top of her clothing. J.M. testified that Onstead also made her touch and "squeeze" his "front private" on one or two occasions. According to J.M., something "[y]ellow and sticky" came out of Onstead's "front private" when she touched it. J.M. testified that Onstead told her not to tell anyone or she would not be able to come to his house anymore.
J.M.'s mother, Mrs. M., testified that Onstead was a "mentor" to the neighborhood *911 children. Onstead also provided significant financial assistance to Mrs. M, even paying her rent when she had been threatened with eviction. Further, Onstead paid some of the utility bills and brought her to Bridge House where she obtained an automobile. Mrs. M., who had been separated from her husband for more than one year, acknowledged she was romantically interested in Onstead, but never pursued her interests. According to Mrs. M., Onstead focused more attention on J.M. Mrs. M. said that Onstead videotaped J.M. during gymnastics and that she had seen one of the videotapes when Onstead allowed her to view the tape through the video camera. However, Onstead kept the tapes and did not give Mrs. M. any copies of them.
Mrs. M. also testified that J.M. had a medical problem in which she had suffered nerve damage to her "bowel area." As a result, J.M. would sometimes have an accident in her clothing. Mrs. M. discussed J.M.'s medical problem with Onstead and he kept extra clothing for J.M. at his home. However, Mrs. M. testified that she never gave Onstead permission to touch J.M. to determine whether J.M. had an accident in her clothing. According to Mrs. M., it would have been "obvious" if an accident had occurred. Mrs. M. testified that she suspected "something out of the ordinary" between Onstead and her children. Although Mrs. M. asked J.M. on a "daily basis," if Onstead had touched her, J.M. always replied negatively.
One day in October of 2000, when J.M.'s father, Mr. M., was visiting the children at J.M.'s house, J.M. revealed that Onstead had touched her. J.M.'s disclosure was prompted after Mr. M. became suspicious when his son, Bill, commented that Mr. M's navel resembled Onstead's navel. Thereafter, Mr. M. asked Bill whether Onstead had ever touched him, and Bill replied that Onstead had tickled him on the stomach. Mr. M. went into the living room, sat down next to J.M. and asked if Onstead had ever touched her. When J.M. nodded, Mr. M. asked her where she had been touched. Mr. M. testified that J.M. placed her right hand over her left breast. Thereafter, J.M.'s mother, Mrs. M., who was sitting in a chair in the living room, took J.M. aside and talked to her. Mr. M. told Mrs. M. that they needed to talk to the police and that J.M. should be questioned before the matter went any further.
J.M. acknowledged at trial that her mother frequently asked her if Onstead had touched her, and she always responded negatively. J.M. said that she could not explain why she had never told her mother, and that she "just felt ... like telling [her] dad." Mr. M. acknowledged that he had prior convictions for D.W.I., possession of marijuana, and possession of Demerol.
At trial, Mrs. M. identified a birthday card that J.M. received from Onstead in November of 2000. The inside of the card is signed, "Happy birthday. Love ya' Mr. Stan." The envelope contains the written message, "Happy birthday, [J.M.]. XXOOXX." Around the same time, Onstead wrote Mrs. M. two letters in which he urged her to contact him, and which accompanied a Thanksgiving turkey for the family. Mrs. M. testified that Onstead asked her not to press charges and desired to resolve the situation out of court. Mrs. M. testified that as a result of the sexual abuse, J.M. was undergoing weekly treatment at the time of trial.
Onstead testified that he is self-employed in the water filtration business, and also deals in "rare" books, estimating that his collection was worth $750,000 to one million dollars. He testified that he had many valuables, such as old toys and dolls, *912 that were kept upstairs to protect them from damage. According to Onstead, the children were not allowed upstairs.
Onstead denied that he had ever touched J.M. in a sexual manner and said he had never been arrested before. According to Onstead, he has lived in the New Orleans area since 1996. In February of 2000, Onstead met some of the neighborhood children, including J.M., her siblings, and some of their friends. After he introduced himself to the parents of the children, the children frequently came over to his house. Onstead acknowledged that he purchased crayons, paints and paper for the children, and that they also watched television at his house.
Onstead testified that he paid for health club memberships for J.M., her siblings, and their friends. He also paid for J.M. to attend gymnastics at the health club, although he had also offered the opportunity to the other children as well. According to Onstead, only J.M. was interested in gymnastics. Onstead also stated that he videotaped J.M. during gymnastics because Mrs. M. did not come to watch J.M. very often, although he also videotaped the other children as well. While Onstead initially said that he showed no preferential treatment to any of the children, he later admitted that J.M. was his "favorite." According to Onstead, J.M. seemed to "crave" or "want" more attention, and that J.M. made a point to be "nice to [him]."
With regard to J.M.'s medical problem, Onstead claimed that J.M. cried to him about other children calling her names. According to Onstead, he knew by the smell that J.M. had an accident in her pants the first time it happened. The next time J.M. had an accident, Onstead asked Mrs. M. about the problem. Onstead said Mrs. M. told him that the nerve damage was so severe that J.M. would frequently not be able to tell if she needed to go to the bathroom or whether she had gone. Thereafter, Onstead bought some underwear and some shorts for J.M., with Mrs. M.'s knowledge, to keep at his house.
Onstead said that if he believed that J.M. had soiled herself, then he would ask her. Sometimes J.M. replied negatively, and he would "feel her little bum" to determine whether she had an accident in her pants. According to Onstead, he did not accompany J.M. to the bathroom when she cleaned herself. Once she had taken care of herself, Onstead would clean out her underpants and put them in the washing machine.
Onstead explained that he bought things for J.M. and her siblings because he enjoyed the kids and because of their situation at home. According to Onstead, the children seldom received anything to eat and came to his house in dirty clothing. Onstead said that Mrs. M. told him that her sister wanted to remove the children from the home because of Mrs. M's drug and alcohol problems. However, Onstead said he never called Child Protection because he did not believe it was necessary. Onstead acknowledged that, in hindsight, he could understand why his attention to the children "doesn't look right."
At the end of September 2000, the children stopped coming over. Onstead went to Mrs. M.'s to see if anything was wrong. Onstead said that Mrs. M. told him what J.M. had said to her father. According to Onstead, Mrs. M. did not believe the allegations, and said that J.M. had later denied the allegations. Onstead said that he was arrested on October 31, 2000.
On appeal, Onstead contends the evidence is legally insufficient to support his conviction because the State failed to prove that he had control or supervision of the juvenile and because the victim's testimony was not credible. The State responds *913 that the evidence was sufficient because the trial judge found the victim's testimony was believable and because it proved all of the elements of the offense beyond a reasonable doubt.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.[1] In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions.[2]
Molestation of a juvenile is defined in LSA-R.S. 14:81.2 as follows:
A. Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.
Thus, the State must prove beyond a reasonable doubt that (1) the accused was over the age of seventeen, (2) the accused committed a lewd or lascivious act upon the person or in the presence of a child under the age of seventeen, (3) the accused was more than two years older than the victim, (4) the accused had the specific intent to arouse or gratify either the child's sexual desires or his own sexual desires, and (5) the accused committed the lewd or lascivious act by use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile.[3] Specific intent is a state of mind and may be inferred from the circumstances and actions of the accused.[4]
The bill of information specifically alleges that Onstead molested J.M. by having a position of control or supervision. In his appellate briefs, Onstead contends that the State failed to prove that he had a position of control or supervision over J.M. According to Onstead, he never had supervision over J.M. while she was at his house. In support of his argument, he cites several cases in which the defendant lived in the home or was related to the child victim. Although the usual scenario may be that the offender is related to the victim or lives in the home, the statute does not mandate these circumstances.[5]
Despite his contentions to the contrary, the record contains evidence, which if believed by the trier of fact, appears to *914 support a finding that Onstead molested J.M. by the use of influence by virtue of his position of control or supervision over J.M. Onstead testified that he asked J.M.'s mother for permission to have her children at his home. His testimony indicates that he had rules for the children to follow at his home, in that he did not allow the children upstairs. Further, the record reflects that Onstead performed caretaking functions for J.M. while she was at his home. When she soiled herself at his house, he cleaned her underpants and told her to wash her hands. With Mrs. M.'s permission, he took J.M. on errands, picked her up from school, and brought her to gymnastics. He bought her toys, clothes and other gifts. Further, J.M.'s testimony indicates he compelled her silence by telling her that she would not be allowed to come to his house anymore if she revealed that he had made her touch him.
Considering the foregoing, we find that the evidence was sufficient to prove that Onstead used influence by virtue of a position of control or supervision, within the meaning of LSA-R.S. 14:81.2, to take advantage of J.M. and to indulge himself. Next, Onstead contends that the evidence is insufficient because no rational trier of fact could have believed J.M.'s testimony. He claims that J.M.'s testimony was not credible because of conflicts between her testimony and that of her parents. According to Onstead, J.M. testified that her grandmother lived in the home at the time of the incident, while Mrs. M. testified that the grandmother lived with them at the time of trial. On direct-examination, J.M. testified that her grandmother lived with them at the time of trial. On cross-examination, J.M. was asked about the people who lived with her at the time she told her dad about the allegations. She replied that it was the same people she had mentioned earlier, and she answered affirmatively when counsel named her grandmother. We find it reasonable to infer from the context of the child's answers, that she was confused by the question on cross-examination, not that she lied.
Onstead also contends that J.M.'s testimony was not credible because she initially reported that he touched her breast, while she testified at trial that he touched her in three places. Further, Onstead asserts the evidence reflects that J.M. lied about her bowel problem. However, as the trial court found when denying Onstead's motion for a judgment of acquittal, J.M. admitted that she had accidents. As pointed out by the trial judge, J.M. may not equate the fact that she had accidents in her pants with a bowel "problem."
In finding Onstead guilty as charged of molestation of a juvenile, the trial judge found J.M. to be a credible witness and provided oral reasons in support of the verdict. Specifically, the court found it significant that J.M. gave such a detailed description as to what happened when J.M. touched Onstead's penis. The trial judge pointed out that J.M. would not have known this information unless it had happened to her, and stated that she had no reason to disbelieve J.M. In particular, the trial judge noted that J.M. had given up a lot in order to come and testify, as she was no longer able to participate in the activities Onstead had paid for, and was not able to have any new clothes or other things that Onstead gave her.
Although Onstead contends that J.M.'s testimony was not believable, the trial judge clearly found otherwise. It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review.[6] *915 The appellate court is not permitted "`to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.'"[7] After reviewing the record, we find that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution could have concluded beyond a reasonable doubt that Onstead was guilty as charged. This assignment of error has no merit.
Onstead also contends that the trial judge erred in denying his motion for a new trial based on newly discovered evidence, and in order to serve the ends of justice. According to Onstead, evidence of the fact that he passed two polygraph tests, and expert testimony from Dr. Pellegrin (that he did not have the traits of a pedophile) compels a new trial. Onstead also contends the trial judge erred in excluding the opinion of Dr. Pellegrin that J.M.'s testimony could have been influenced by other external factors. Finally, Onstead contends that the trial judge erred in excluding testimony from his psychologist, Dr. Galloway, that he had not observed any indication that he (Onstead) was a pedophile.
At the hearing on the motion for new trial on January 31, 2003, Dr. Pellegrin, an expert clinical psychologist, testified that she had administered the Minnesota Multi-Phasic Personality Inventory II test to Onstead and that he did not show any evidence of deviant sexual behavior or evidence of sexually deviant behavior regarding children. Dr. Pellegrin also testified that the Sexual Abuse Inventory test did not reveal any signs usually associated with sexual offenders. Further, Dr. Pellegrin testified that she had concerns about the validity of the child's report because the mother's trial testimony revealed that the mother repeatedly asked the child whether she had ever been touched. According to Dr. Pellegrin, repeating such a question to a child could lead to a false report. The trial judge sustained the State's objection to the entirety of Dr. Pellegrin's testimony on the basis that it was not newly discovered evidence. The court allowed Onstead to proffer the remainder of Dr. Pellegrin's testimony.
The court also ruled that the testimony of Dr. Galloway, was not admissible because it was irrelevant, not only because the testimony related to Dr. Galloway's post-trial treatment of Onstead but also because it was not newly discovered evidence. Onstead asserted that he would proffer Dr. Galloway's testimony by way of a written report, but the record does not contain any reports by Dr. Galloway.
At the hearing, Onstead asserted that he had taken a polygraph test before and after trial. The defense and the State joined in a stipulation that the polygraph examiners would testify consistent with their reports, that Onstead was truthful when he denied that there had been any inappropriate touching, or that any of the allegations of the offense were true. The trial judge stated for the record that she was aware of the results of the polygraph before trial. Additionally, the defense and State stipulated that several family members were present at the hearing who would testify, if called, that the allegations made in this case are not consistent with their knowledge of Onstead. Finally, Onstead *916 offered the video taped interview with the child as an exhibit under seal. The trial court held the matter open, and on February 28, 2003, denied the motion for new trial on the basis that Onstead did not present any evidence that could not have been discovered before trial.
A motion for new trial is based upon the supposition that an injustice has been done to the defendant, and, unless such injustice is shown, the motion shall be denied no matter upon what allegations the new trial is grounded. LSA-C.Cr.P. art. 851. According to Article 851, the court shall grant a new trial upon the defendant's motion under the following circumstances:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
A defendant seeking a new trial based on newly discovered evidence must establish that: 1) the evidence was discovered since the trial, 2) failure to learn of the evidence prior to trial was not due to defendant's lack of diligence, 3) the evidence is material to the issues at the trial, and 4) the evidence is of such a nature that it would probably produce a different verdict in the event of a retrial.[8] The ruling on a motion for new trial is within the sound discretion of the trial judge and will be disturbed on appeal only when there is a clear showing of abuse of that discretion.[9]
At the hearing, Onstead argued for a new trial in his case on the basis of newly discovered evidence, and in order to serve the ends of justice. This Court has previously held that a claim for new trial based on the ground that the ends of justice would be served presents nothing for appellate review.[10]
Regarding the polygraph tests, the Louisiana Supreme Court has recognized that polygraph evidence, while inadmissible at trial, may be admissible at a hearing on a motion for new trial under certain circumstances.[11] In the present case, the trial judge specifically stated that she was aware of the polygraph results prior to trial. The court obviously did not believe that the two examinations warranted *917 a new trial, and that decision was soundly within the judge's discretion.[12]
Further, Onstead did not show that, notwithstanding the exercise of reasonable diligence, the testimony of Dr. Pellegrin and Dr. Galloway was not discoverable before or during trial. Additionally, even if it were newly discovered evidence, we do not find that the testimony was material and would have produced a different result. The trial judge stated at the motion for new trial hearing that she had seriously considered all of the issues at trial and did not reach the guilty verdict lightly. After carefully reviewing all of the evidence, we are unable to conclude that the evidence would have produced a result other than a verdict of guilty as charged.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920.[13] On review, we note that the trial transcript reflects that while defense counsel waived a jury trial on Onstead's behalf, the minute entry is silent on this issue. Further, we find the validity of the waiver to be in question. Under LSA-R.S. 14:81.2, Onstead was entitled to a jury trial of six persons. Although the right to a jury trial may be waived in non-capital cases, it must be "knowingly and intelligently" waived. LSA-C.Cr.P. art. 780(A). Waiver of this right is never presumed.[14]
In the present case, at the very start of the trial the following exchange occurred in Onstead's presence:
THE COURT:
All right. Opening statement, State?
MR. MARY:
Judge, I believe Mr. Onstead has to waive
THE COURT:
Oh, yeah. Waive
MR. WHALEN:
Oh, I'm sorry, Your Honor. Yes. For the record, we would waive a jury trial in the matter and request that Mr. Onstead be tried by the Judge alone.
THE COURT:
All right. Opening statement, State?
This Court has previously held, on error patent review, that similar exchanges do not, in and of themselves, constitute a valid waiver of the defendant's right to a trial by jury.[15] Our Supreme Court has noted that while it is preferable for the trial court to advise a defendant of the right to trial by jury in open court before obtaining a waiver, it is not statutorily required.[16] Additionally, the court declared that it is preferable, but not necessary, for a defendant to personally waive the right to a jury trial. "... [c]ounsel may waive the right on the defendant's behalf, provided that the defendant's decision to do so was made knowingly and intelligently."[17] In that case, defense counsel specifically stated that he and his client had discussed the waiver at length on several *918 occasions, and that both had agreed to the waiver. In the present matter, defense counsel did not refer to any discussion with Onstead on this issue. Thus, there is no indication on the record that Onstead knowingly and intelligently waived his right to a jury trial.
For this reason, we are compelled to remand the matter, and will adhere to the procedure previously set out by the Supreme Court, instructing the trial court to conduct an evidentiary hearing solely to determine whether or not Onstead affirmatively waived his right to a jury trial.[18]
For the foregoing reasons, we conditionally affirm the conviction and sentence, and remand the matter to the trial court for an evidentiary hearing to determine whether Onstead validly waived his right to a jury trial.
CONVICTION AND SENTENCE CONDITIONALLY AFFIRMED; HEARING ORDERED ON ISSUE OF VALID WAIVER OF JURY TRIAL.
NOTES
[1] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tilley, 99-569 (La.7/6/00), 767 So.2d 6, 24, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001).
[2] State v. Breaux, 02-382 (La.App. 5 Cir. 10/16/02), 830 So.2d 1003, 1009.
[3] State v. LeBlanc, 506 So.2d 1197, 1199 (La. 1987); State v. Breaux, 830 So.2d at 1010.
[4] State v. Graham, 420 So.2d 1126, 1127 (La. 1982).
[5] See e.g. State v. Davis, 97-331 (La.App. 3 Cir. 10/29/97), 702 So.2d 1014, writ denied, 97-2990 (La.11/6/98), 726 So.2d 919.
[6] State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). Accord, State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297.
[7] State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50, (quoting State v. Mussall, 523 So.2d 1305, 1311 (La.1988)).
[8] See, State v. Brisban, 00-3437 (La.2/26/02), 809 So.2d 923, 931; State v. Knapper, 555 So.2d 1335, 1339 (La.1990).
[9] State v. Tracy, 02-0227 (La.App. 5 Cir. 10/29/02), 831 So.2d 503, 512, writ denied, 02-2900 (La.4/4/03), 840 So.2d 1213.
[10] See, State v. East, 99-1379 (La.App. 5 Cir. 7/25/00), 768 So.2d 173, 179, writ denied, 01-3025 (La.10/25/02), 827 So.2d 1167.
[11] See, State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, 35-36, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998).
[12] See State v. Humphrey, 445 So.2d 1155 (La.1984).
[13] State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[14] State v. McCarroll, 337 So.2d 475, 480 (La.1976).
[15] State v. Pierre, 98-1123 (La.App. 5 Cir. 4/14/99), 733 So.2d 674, 679; State v. Terrase, 02-1009 (La.App. 5 Cir. 2/25/03), 841 So.2d 947, 950.
[16] State v. Pierre, 02-2665 (La.3/28/03), 842 So.2d 321.
[17] Id.
[18] See State v. Nanlal, 97-786 (La.9/26/97), 701 So.2d 963, 963-964; State v. Hampton, 00-1002 (La.App. 5 Cir. 1/23/01), 782 So.2d 1045.